US DISTRICT COURT INDEX SHEET

















RYC    8/30/05    12:00
3:02-CV-46 NICHOLS INSTITUTE V. SCANTIBODIES CLINIC
*623*
*O.*

FILED

AUG 3 0 2005

CLERK U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY                                    DEPUTY

1

2

3

4

5

6

7

8                  UNITED STATES DISTRICT COURT

9                 SOUTHERN DISTRICT OF CALIFORNIA

10

11   NICHOLS INSTITUTE              CASE NO.  02CV0046-B (JMA)
     DIAGNOSTICS, INC.,
12                                  ORDER RE:  POST-VERDICT
                          Plaintiff,   MOTIONS
13        vs.

14   SCANTIBODIES CLINICAL          [Docket Nos. 572, 574, 577, & 611]
     LABORATORY, INC.; and
15   SCANTIBODIES LABORATORY,
     INC.,
16                        Defendants.

17    and related counterclaim.

18

19        Plaintiff Nichols Institute Diagnostics, Inc., brought suit against Defendants Scantibodies

20   Clinical Laboratory, Inc., and Scantibodies Laboratory, Inc., for the alleged infringement of

21   United States Patent No. 6,030,790 (the '790 patent).  The '790 patent describes antibodies and

22   assays that can be used to detect biologically active human parathyroid hormone (hPTH), which

23   is used to detect and regulate concentrations of calcium.[1]  Nichols alleged that two of

24

25        [1]hPTH is a peptide hormone consisting of 84 amino acids, not all of which are
     required for the hormone to be biologically active.  hPTH (1-37) is a circulating N-terminal
26   fragment that encompasses the full biological activity of the entire hormone.  The
     parenthetical denotes a length of thirty-seven amino acids including the first two amino acids
27   needed for biological activity.  The first two amino acids, serine and valine, are crucial to the
     biological activity of hPTH.  The '790 patent discloses an assay to detect active hPTH using
28   two antibodies capable of recognizing and selectively binding separate portions of hPTH (1-
                                                                        (continued...)



1   Scantibodies' antibody products infringed Claim 17 and its dependent claims, Claims 20-25, of

2   the '790 patent.[2]   In a counter suit, Scantibodies defended the allegations and challenged the

3   validity of the '790 patent.

4          Following a bench trial on the equitable defense of inequitable conduct by Plaintiff, the

5   Court determined that Defendants' inequitable conduct defense failed.  Following a four-week

6   jury trial on the causes of action at law, the jury returned a verdict that Scantibodies' 1-9

7   antibody, but not the 1-12 antibody, infringed Nichols' '790 patent.  The jury also found that

8   Scantibodies had met its burden of proof by clear and convincing evidence that the patent was

9   invalid for failure to comply with the written description, enablement, and best mode

10  requirements of 35 U.S.C. § 112, but that Scantibodies failed to demonstrate that the '790 patent

11  was obvious under § 103.  The Court had earlier granted summary adjudication for Plaintiff that

12  the '790 patent was not invalid for anticipation under § 102.

13

14          [1](...continued)
    37).  The patent lists thirty-five peptides of hPTH for which antibodies can be generated,
15  covering the N-terminal, middle and C-terminal regions of hPTH.  One set of antibodies
    disclosed in the patent selectively binds peptides of the N-terminal region of hPTH,
16  Sequence Identification Numbers 1-6 ("Seq. ID No.") (representing amino acid sequences 1-
    10, 1-9, 1-8, 1-7, 1-6 and 1-5 of hPTH, respectively).  Each of these peptides includes the N-
17  terminal serine and valine of hPTH.

18          [2]These claims pertain to antibodies that bind to the N-terminal hPTH peptides Seq. ID
    Nos. 1-6.  As construed by the Court, Claim 17 means:
19          A combination of material formed from two or more substances **comprising**
            [*including but not limited to*] an **antibody** [*a protein produced by blood plasma cells*
20          *that bind specifically to a foreign substance*] or **antibody fragment** [*broken-off or*
            *detached piece of an antibody*] and a **suitable carrier** [*any substance that serves to*
21          *facilitate the ability of an antibody to seize an antigen.  Since antibodies and antigens*
            *vary greatly, a suitable carrier would be one or more substances which maximize the*
22          *immunoassay process for the particular antibodies and antigens sought.  A suitable*
            *carrier may be liquid or solid*], wherein the antibody or antibody fragment **selectively**
23          **binds** [*seeks out specifically and attaches to a specific arrangement of atoms or*
            *molecules*] a **peptide** [*a molecule consisting of from 2 to usually less than 100 amino*
24          *acids bonded together in a particular sequence*] of human parathyroid hormone
            (hPTH) selected from the group of peptides consisting of **peptides** having SEQ. ID.
25          Nos. 1-6.
    The Court construed dependent Claim 21 as:
26          The composition of claim 17, wherein the **antibody** [*a protein produced by blood*
            *plasma cells that bind specifically to a foreign substance*] or **antibody fragment**
27          [*broken-off or detached piece of an antibody*] **selectively binds** [*seeks out specifically*
            *and attaches to a specific arrangement of atoms or molecules*] **peptides** [*molecules*
28          *consisting of from 2 to usually less than 100 amino acids bonded together in a*
            *particular sequence*] of hPTH having SEQ ID No. 2.

1    Pursuant to Rule 50(b) of the Federal Rules of Civil Procedure, Nichols and Scantibodies

2    renew their motions for judgment as a matter of law (JMOL) on the issues of invalidity and

3    infringement. In the alternative, Nichols requests that the Court order a new trial. Fed. R. Civ.

4    P. 59.[3]

5    I. Judgment as a Matter of Law

6       "Judgment as a matter of law is proper if the evidence, construed in the light most

7    favorable to the nonmoving party, permits only one reasonable conclusion, and that conclusion

8    is contrary to the jury's." *Scott v. Ross,* 140 F.3d 1275, 1281 (9th Cir. 1998). "A motion for

9    judgment as a matter of law should be granted only if the verdict is against the great weight of

10   the evidence, or it is quite clear that the jury has reached a seriously erroneous result." *McEuin*

11   *v. Crown Equip. Corp.,* 328 F.3d 1028, 1036 (9th Cir. 2003) (quotation marks and citations

12   omitted); *accord Perkin-Elmer Corp. v. Computervision Corp.,* 732 F.2d 888, 893 (Fed. Cir.

13   1984) (applying Ninth Circuit law). "Substantial evidence is such relevant evidence as

14   reasonable minds might accept as adequate to support a conclusion even if it is possible to draw

15   two inconsistent conclusions from the evidence." *Landes Constr. Co., Inc. v. Royal Bank of*

16   *Canada,* 833 F.2d 1365, 1371 (9th Cir. 1987). When reviewing the jury's decision, the district

17   court cannot weigh the evidence and cannot assess the credibility of witnesses. *Id.*; *accord*

18   *Perkin-Elmer,* 732 F.2d at 893.

19      Patents are presumed valid, therefore, invalidity must be proven by clear and convincing

20   evidence. *Railroad Dynamics, Inc., v. A. Stucki Co.,* 727 F.2d 1506, 1551 (Fed. Cir. 1984).

21   Consequently, the question in these JMOL motions is whether there was substantial evidence

22   that Scantibodies proved by clear and convincing evidence that the '790 patent was invalid on

23   each of the § 112 issues and whether as a matter of law, these findings can stand. *Perkin-Elmer,*

24   732 F.2d at 893 ("In its review, the district court must not lose sight of the presumption of

25   validity.").

26   _____

27       [3]In patent cases, the district court applies Ninth Circuit standards to resolve post-
     judgment motions. *Seachange Int'l, Inc. v. C-COR, Inc.,* 413 F.3d 1361, 1367-68 (Fed. Cir.
28   2005) (JMOL and new trial motions determined by regional circuit law); *Union Carbide*
     *Chemicals & Plastics Tech. Corp. v. Shell Oil Co.,* 308 F.3d 1167, 1182 (Fed. Cir. 2002)
     (collecting cases that "motion for new trial is a procedural issue not unique to patent law").

A. Nichols' JMOL on '790 Patent Validity

Nichols moves to set aside the jury's verdict that Scantibodies had proven by clear and convincing evidence that the '790 patent was invalid for failure to comply with the written description, enablement, and best mode requirements of § 112.[4]

1. Written Description of the Invention

To comply with the written description requirement, the patent must provide sufficient description to show a person skilled in the art that the inventor possessed the claimed invention at the time of filing.[5] *See University of Rochester v. G.D. Searle & Co.*, 358 F.3d 916, 927-28 (Fed. Cir.), *cert. denied*, 125 S.Ct. 629 (2004); *Vas-Cath, Inc. v. Mahurkar*, 935 F.2d 1555, 1563 (Fed. Cir. 1991). "The 'written description' requirement implements the principle that a patent must describe the technology that is sought to be patented; the requirement serves both to satisfy the inventor's obligation to disclose the technologic knowledge upon which the patent is based, and to demonstrate that the patentee was in possession of the invention that is claimed." *Capon v. Eshhar*, __ F.3d __, 2005 WL 1926027, *7-8 (Fed. Cir. Aug. 12, 2005). This is a question of fact reviewed for substantial evidence. *Koito Mfg. Co. v. Turn-Key, LLC.*, 381 F.3d 1142, 1149 (Fed. Cir. 2004) (applying Ninth Circuit law); *Vas-Cath*, 935 F.2d at 1563; *see also Capon*, 2005 WL 1926027, *8 ("The 'written description' requirement must be applied in the context of the particular invention and the state of the knowledge.").

Scantibodies defends the jury's verdict and argues that there was clear and convincing evidence that the '790 patent was inadequately described. Scantibodies relies on testimony that the specification does not indicate that the inventors actually produced, made, or developed any

[4]A patent must describe in its specification "a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same" and "the best mode contemplated by the inventor of carrying out his invention." 35 U.S.C. § 112.

[5]The parties agreed that a person skilled in the art in this case would have at least a Masters of Science degree, and preferably a Ph.D. in Immunology or Biochemistry with experience in the techniques of peptide synthesis, protein purification, monoclonal and polyclonal antibody production (immunization and isolation), affinity purification, and the design and performance of immunoassays for screening antibodies and for detecting antigens in a sample. Court's Jury Instruction No. 20; *see* Scantibodies' Proposed Jury Instruction No. 26.

1  claimed antibodies prior to filing their patent application. Defs.' Consol. Opp. Br. at 7-8 (citing

2  Tr. X at 52-53 (Dr. Randolph Wall); Tr. XI at 139 (Dr. Woodhead); & Tr. XII at 141 (Dr. Claude

3  Arnaud)).

4      These citations are irrelevant, as Scantibodies misapprehends the law regarding written

5  description. There is no requirement that an inventor be in *physical* possession or actually have

6  made a composition before seeking a patent on the invention. A constructive reduction to

7  practice is sufficient (as long as the claims are enabled). *See Hyatt v. Boone*, 146 F.3d 1348,

8  1352 (Fed. Cir. 1998); *Kawai v. Metlesics*, 480 F.2d 880, 886 (C.C.P.A. 1973). Because an

9  actual reduction to practice is not required, the '790 patent is adequately described if the

10 specification would demonstrate to one of skill in the art that the inventors held a *mental*

11 possession of the claimed antibodies. *See Lockwood v. American Airlines, Inc.*, 107 F.3d 1565,

12 1572 (Fed. Cir. 1997) ("One shows that one is 'in possession' of *the invention* by describing *the*

13 *invention*, with all its claimed limitations.") (citing *Vas-Cath*, 935 F.2d at 1563-64).

14     Using the correct standard, the Court finds as a matter of law that the specification of the

15 '790 patent is sufficient. "As long as an applicant has disclosed a 'fully characterized antigen,'

16 either by its structure, formula, chemical name, or physical properties . . . the applicant can then

17 claim an antibody by its binding affinity to that described antigen." *Noelle v. Lederman*, 355

18 F.3d 1343, 1348 (Fed. Cir. 2004) (emphasis omitted); *Enzo Biochem, Inc. v. Gen-Probe Inc.*, 323

19 F.3d 956, 964 (Fed. Cir. 2002) (adopting standard in Manual of Patent Examining Procedure,

20 66 Fed. Reg. 1106); *Amgen Inc. v. Hoechst Marion Roussel, Inc.,* 314 F.3d 1313, 1332 (Fed. Cir.

21 2003) (written description requirement may be satisfied "if in the knowledge of the art the

22 disclosed function is sufficiently correlated to a particular, known structure"). All of the experts

23 testified that the peptides described in the patent bind to the antibodies claimed in the patent.

24 *E.g.*, Tr. VI at 76 (Dr. Maegerlein); Tr. X at 65, 147-48 (Dr. Wall). The evidence on this point

25 was not contradicted, thus, the jury's decision is erroneous as a matter of law.

26     In defense of its position, Scantibodies argues that the '790 patent fails the *Noelle* test

27 because the specification does not describe the secondary and tertiary structure of hPTH. This

28 argument fails. First, the *Noelle* test is satisfied when specification provides either the formula

- 5 -

1  or the structure and the binding affinity. *Noelle*, 355 F.3d at 1348. Here the specification

2  provides the formula of the antigens and that the antibodies selectively bind to these antibodies.

3  Second, the described antigens are not hPTH but rather peptides consisting of Seq. ID. Nos. 1-6,

4  therefore the secondary and tertiary structure of hPTH is simply not relevant.

5  In sum, the Court agrees with Nichols that the specification of the '790 patent provides

6  the chemical formulas of Seq. ID. Nos. 1-6. The Court finds that, with regard to Claims 17 and

7  20 to 25, the '790 patent complies with the written description requirement because the patent

8  fully described the antibody by providing the chemical formula of its antigen and by stating that

9  the antibody must selectively bind to that antigen.

10  ## 2. Enablement

11  The second requirement of § 112, the enablement requirement, is related but independent.

12  "To be enabling, the specification of a patent must teach those skilled in the art how to make and

13  use the full scope of the claimed invention without 'undue experimentation.'" *In re Wright*, 999

14  F.2d 1557, 1561 (Fed. Cir. 1993), *quoted in Genentech Inc. v. Novo Nordisk A/S*, 108 F.3d 1361,

15  1365 (Fed. Cir. 1997). Undue experimentation means that the "trial and error required to

16  practice the invention would be unduly laborious or beyond the reach of one of ordinary skill in

17  the art." *Koito Mfg.*, 381 F.3d at 1155; *Atlas Powder Co. v. E.I. DuPont de Nemours & Co.*, 750

18  F.2d 1569, 1576 (Fed. Cir. 1984) ("That some experimentation is necessary does not preclude

19  enablement; the amount of experimentation, however, must not be unduly extensive.").

20  An important clarification of the enablement standard is that "a patent applicant does not

21  need to include in the specification that which is already known to and available to one of

22  ordinary skill in the art." *Koito Mfg.*, 381 F.3d at 1155; *Spectra-Physics, Inc. v. Coherent, Inc.*,

23  827 F.2d 1524, 1533 (Fed. Cir. 1987) (patent does not need to include old and well known

24  techniques); *Hybritech, Inc. v. Monoclonal Antibodies, Inc.*, 802 F.2d 1367, 1385 (Fed. Cir.

25  1986) ("a patent need not teach, and preferably omits, what is well known in the art"). Under

26  "the statutory mandate of conciseness," inventors are "admonished against including in the

27  specification material that is known in the art." *Atmel Corp. v. Information Storage Devices,*

28  *Inc.*, 198 F.3d 1374, 1386 (Fed. Cir. 1999) (explaining policy of concise patents).

1    Enablement is a question of law; however, there may be underlying factual questions,

2    which would be reviewed for substantial evidence. *Koito*, 381 F.3d at 1149; *Spectra-Physics*,

3    827 F.2d at 1533.

4    The Court agrees with Nichols, that Scantibodies presented merely conclusory expert

5    testimony that the amount of experimentation needed to practice the claims at issue would be

6    "undue." *E.g., Bruning v. Hirose*, 161 F.3d 681, 686 (Fed. Cir. 1998). Scantibodies failed to

7    present evidence that any trial and error research was needed to practice the claims, let alone any

8    that would unduly laborious.

9    Scantibodies relies on the testimony of its experts, Dr. Wall and Dr. Stuart Woodhead.

10   Defs.' Consol. Opp. Br. at 3-6. The record does not support Scantibodies' view of this

11   testimony.[6] Upon examination, Dr. Wall's testimony cannot, as a matter of law, support a

12   finding of lack of enablement. As an initial matter, Dr. Wall admitted that one would choose

13   between one of the six specified peptide sequences for immunization. Tr. X at 43:18-20.

14   Choosing among six identified, possible peptides as a matter of law is not undue

15   experimentation. *In re Wands*, 858 F.2d 731, 736-40 & n.29 (Fed. Cir. 1988) (undue

16   experimentation "test is not merely quantitative, since a considerable amount of experimentation

17   is permissible, if it is merely routine"; scientists knew how to screen to find desired antibody);

18   *Hybritech*, 802 F.2d at 1384 (patent met enablement requirement by disclosing method of

19   obtaining antibodies and that screening process was well-known in the art); *cf. Scripps Clinic*

20   *& Research Found. v. Genentech, Inc.*, 927 F.2d 1565, 1579 (Fed. Cir. 1991) (in context of best

21

22   [6]Scantibodies did not accurately portray Dr. Wall's testimony in two respects. First, Scantibodies states that Dr. Wall testified that the specification did not identify which

23   peptides to immunize an animal with, which carrier protein to use, which species of animal to immunize, how often to boost, or which peptide to use for affinity purification of the

24   antisera. Defs.' Consol. Opp. Br. at 3. However, a review of Dr. Wall's trial testimony shows that he only testified that the specification failed to identify which peptides to use and

25   which animals to immunize. Tr. X at 43:15-44:6, 61:8-17.
     Scantibodies also claims Dr. Wall testified that the specification fails to identify

26   which preparation to use for immunization (Multiple Antigenic Peptides (MAP) or carrier protein). Defs.' Consol. Opp. Br. at 3. The record does not support this allegation. Dr. Wall

27   actually testified that the specification identified both the use of MAPs and carrier proteins but did not identify which method is preferred. Tr. X at 43:16-17. This is not evidence of

28   lack of enablement. Moreover, the jury could not have relied on this distinction, since they found the patent invalid both with and without the certificate of correction, yet, the correction gave the information about MAPs.

1   mode, Court found as a matter of law that antibodies screened were "all obtained by routine and

2   admittedly time-consuming procedures"). Furthermore, dependent Claims 20-25 are limited to

3   individual peptide sequences. Significantly, *any of the six* peptides would work.

4        With regard to the patent's alleged failure to identify which animal species to immunize,

5   Scantibodies relies on Dr. Wall's discussion of the Logue paper. Wall testified that in 1991, Dr.

6   Logue sought to make monoclonal antibodies to PTH 1-34. To achieve this, Logue immunized

7   mice, rats, and sheep with peptides of hPTH 1-10. Tr. X at 48:5-7. Wall then testified that

8   Logue was unable to produce antibodies using mice, but produced antibodies in rats and sheep.

9   *Id.* at 50:2-6. Since Logue's experiment occurred three years prior to the filing date of the '790

10  patent, and Logue used three species of animals with positive results in two of those species, this

11  does not qualify as evidence of a failure to list species requiring undue experimentation to

12  practice the patent. Scantibodies' argument is ironic because Logue *successfully produced two*

13  *antibodies.* The evidence permits only one conclusion – the patent effectively taught "those

14  skilled in the art how to make and use the full scope of the claimed invention without 'undue

15  experimentation.'" *Genentech*, 108 F.3d at 1365; *Hybritech*, 802 F.2d at 1384-85 (best mode

16  requirement met because screening process is "labor-intensive and time-consuming" but a

17  sophisticated, competent scientist could produce, screen, and measure the antibodies so as to

18  practice the invention).

19       Scantibodies also relies on Dr. Wall's testimony that "[h]aving to try all 35 would be a

20  lot of experimentation. People in my lab would revolt before they would do that." Tr. X at 43.

21  This, however, is a conclusion of law, and in any event, irrelevant since it is not based on

22  evidence in this case.

23       Scantibodies' reliance on Dr. Woodhead's testimony is equally unavailing because his

24  testimony closely parallels Dr. Wall's. Tr. XI at 135:25-140:5. Dr. Woodhead testified that the

25  specification fails to identify which peptides to use or which animals to immunize. As to the

26  former conclusion, he is incorrect; as to the latter, that information is in the prior art.

27       Finally, Scantibodies cites evidence that the antibodies disclosed in the '790 patent fail

28  to detect the whole PTH molecule at normal concentrations in human blood. But this testimony

- 8 -

1   is irrelevant to whether Claims 17 and 20-25 are enabled.  The patent claims at issue here only

2   require that one of skill in the art be able to make an antibody that selectively binds to a peptide

3   selected from a group consisting of Seq. ID. Nos. 1-6, not to a whole peptide of hPTH.

4   Furthermore, the claims are not limited to detecting peptides at normal concentrations in human

5   blood.

6         Given the evidence that was presented to the jury, the Court finds that, as a matter of law,

7   Scantibodies failed to prove by clear and convincing evidence that Claims 17 and 20-25 are

8   invalid for lack of enablement.  Therefore, the Court grants Nichols' motion with respect to

9   enablement because the evidence does not support that choosing among up to six peptides and

10  the various known possible animal hosts would require undue experimentation.  Instead, the

11  evidence demonstrated that a person of skill in the art would have been able to readily practice

12  the invention. Tr. II at 101-10 & 158-64 (Dr. Vitetta testified would "know exactly what to do");

13  Tr IX at 80-81 (Dr. Richard Lerner testified that by 1994 it was possible to buy anti-peptide

14  antibodies); Tr. X at 95 (Dr. Wall "certainly could have directed someone" to make these

15  antibodies); Tr. XI at 123-24 (Dr. Woodhead agreed with Dr. Vitetta's testimony that a person

16  of ordinary skill could have made the antibodies claimed in the patent in 1994); *see also e.g.,* Tr.

17  VII at 15-19, 25 (Dr. Falkinham describes process to identify antibodies learned in graduate

18  school).  The evidence in the record demonstrates that the jury reached a seriously erroneous

19  result on enablement.

20                    3. Best Mode

21         As to the third element of § 112, Nichols argues that the jury's verdict of invalidity for

22  failing to disclose a best mode is not supported by substantial evidence.  Scantibodies contends

23  that the evidence demonstrated that the specification failed to disclose three features of the best

24  mode, including the K-2 antibody, the use of multiple antigenic peptides (MAPs) to immunize

25  animals, and affinity purification of the antibodies using the 1-27 hPTH peptide.

26         As explained below, the Court finds that the patentee had a best mode, and that the

27  inventors complied with the obligation to disclose it. The jury found that Nichols had a best

28  mode, and the Court will not disturb the jury's fact finding on that subjective component. While

1    that finding opens the door to a best mode defense, the record shows that Nichols adequately

2    disclosed the required information. The record shows that the best mode involved infusion into

3    the host animal, withdrawal of blood after incubation, and purification to isolate the antibodies

4    – and each of these steps was well-known in the field.[7] Each expert testified that these processes

5    were well-known in the art and there is no dispute in the evidence. In sum, Scantibodies focuses

6    on the method of obtaining antibodies, but the method is not the invention. *E.g.,* Tr. VII at 24-25

7    (Dr. Falkinham testifies that '790 patent "isn't a method for developing antibodies" and "doesn't

8    have anything to do with developing an immunoassay"). The invention is the detection of *active*

9    hPTH.[8] *E.g., id.* at 25:12-21, 49:2:6, 59-62. The patent claimed that unique and specific

10   antibody, and the specification very clearly explained exactly *what* should be infused into the

11   host animal so that the unique discriminating antibody would be produced. The rest of the

12   process was well known.

13                                    (a) Standard

14           "Compliance with the best mode requirement is a question of fact, and invalidity for

15   failure of compliance requires proof by clear and convincing evidence that the inventor knew

16   of and concealed a better mode of carrying out the invention than was set forth in the

17   specification." *Scripps Clinic*, 927 F.2d at 1578. The statute requires that a patent "shall set

18   forth the best mode contemplated by the inventor of carrying out his invention." 35 U.S.C. §

19   112. In interpreting the best mode requirement, courts generally apply a two-pronged inquiry.

20   *See e.g., Eli Lilly and Co. v. Barr Labs.*, 251 F.3d 955, 963 (Fed. Cir. 2001) (en banc). First, did

21   the inventors at the time of filing contemplate or have a best mode? Second, if there was a best

22   mode, is it adequately described in the application such that one of skill in the art could practice

23   that mode? *Id.* The first prong of this test is subjective, while the second prong is an objective

24   question focused on the state of the art at the time of filing. *Id.*

25           Best mode focuses only on the claimed invention. The extent of the disclosure required

26   _____

27      [7]In addition, the Court concludes that its jury instruction on best mode was inaccurate
     and misled the jury. This issue is addressed in Nichols' new trial motion, *infra* pages 25-28.

28      [8]This point is further discussed below, *infra* pages 15-20, relative to the competing
     JMOL motions regarding claim construction of the term "selectively binds."

1    to satisfy the requirement depends on the scope of the claims at issue. *Id.* "Preferences that are

2    reflected in a preferred embodiment or that relate to making or using the invention and have a

3    material effect on the properties of the invention must be disclosed." *Bayer AG v. Schein*

4    *Pharms., Inc.*, 301 F.3d 1306, 1321 (Fed. Cir. 2002). For example, in *Dana Corp. v. IPC Ltd.*

5    *P'ship*, 860 F.2d 415, 418 (Fed. Cir. 1989), the inventors knew but failed to disclose a method

6    of treating a claimed seal that contributed to its ability to control leakage. Because the surface

7    treatment was necessary to the satisfactory performance of the claimed invention, failure to

8    disclose the treatment constituted a best mode violation. *Id.* at 420. In *Chemcast Corp. v. ARCO*

9    *Indus. Corp.*, 913 F.2d 923, 928 (Fed. Cir. 1990), the inventors violated the best mode

10   requirement when they failed to disclose their preferred embodiment. The application claimed

11   a grommet with a particular rigidity for sealing openings in a panel. *Id.* at 924. Although the

12   inventor was only aware of and used only one type of material that had the required properties

13   to make the grommet, the patent did not disclose this material. *Id.* at 929.

14          However, "not every preference [of an inventor] constitutes a best mode of carrying out

15   the invention." *Bayer,* 301 F.3d at 1321. Preferred methods and materials used in production

16   need not be disclosed if they do not influence the intrinsic quality of the claimed composition.

17   For instance, in *Bayer*, the method of synthesizing an intermediate compound in the production

18   did not affect the qualities of the claimed antibiotic. *Id.* at 1321. Hence, the Court held that the

19   failure to disclose the inventor's preferred synthetic route to the intermediate was not a best

20   mode violation. *Id.* at 1313-23; *see also High Concrete Structures, Inc. v. New Enter. Stone &*

21   *Lime Co.*, 377 F.3d 1379, 1384 (Fed. Cir. 2004) (holding that failure to disclose details not

22   necessary to the qualities of the claimed invention did not violate the best mode requirement);

23   *Teleflex, Inc. v. Ficos N. Am. Corp.*, 299 F.3d 1313, 1333 (Fed. Cir. 2002) (same); *Eli Lilly,* 251

24   F.3d at 956 (same).

25          Additionally, even when particular information is necessary or influences the intrinsic

26   quality of the claimed invention, the level of detail required for an adequate best mode disclosure

27   depends on the level of skill in the art. For example, in *Robotic Vision Sys. Inc. v. View Eng'g,*

28   *Inc.*, 112 F.3d 1163, 1164 (Fed. Cir. 1997), the patent claimed a method for scanning circuit

1   chips using a sensor device.  At the time the patent was filed, the inventors had only one mode

2   for practicing the invention using software and a computer to control the motor that moved the

3   scanning sensor, but this mode was not described in the patent.  *Id.* at 1166.  The Court found

4   that even though the claim did not include the computer and software, the unclaimed subject

5   matter was not exempted from the best mode requirement.  *Id.*  Nonetheless, the Court also held

6   that the mode was implicit to the patent; the use of software with the device would have been

7   apparent to one of skill in the art and therefore, there was no best mode violation.  *Id.*  Similarly,

8   in *Young Dental Mfg. Co. v. Q3 Special Prod., Inc.*, 112 F.3d 1137, 1144-45 (Fed. Cir. 1997),

9   the patent described gear shapes and structures for use with the claimed tooth-polishing device

10  but did not provide gear ratios or the grade of plastics the inventors used in their device.  The

11  Court found that this information, although related to the quality and nature of the claimed

12  device, represented routine details that would be readily apparent to one of skill in the art and

13  therefore need not be disclosed to satisfy the best mode requirement.  *Id.*; *see also Eli Lilly*, 251

14  F.3d at 963-66 (failure to disclose inventors' preference for a re-crystallization solvent was not

15  a best mode violation because the patent disclosed re-crystallization and the solvent was a

16  routine detail apparent to one of skill in the art).

17                              (b)  Analysis

18          Applying the law to the evidence introduced at trial in this case, the Court finds that there

19  was substantial evidence to indicate that the inventors had a best mode but that this mode was

20  adequately disclosed in the '790 patent in view of the state of the art.  While the jury's factual

21  finding that the inventor contemplated a best mode will not be disturbed by the Court, the

22  ultimate conclusion reached by the jury was erroneous as a matter of law.  The claimed

23  invention, set forth in Claim 17 and Claims 21-25 dependent thereon, is an antibody that

24  selectively binds a peptide containing a particular amino acid sequence of hPTH (Seq. ID Nos.

25  1-6).  *See generally* Tr. VII at 66-97 (Dr. Falkinham).  The inventive property of the antibody

26  over the prior art is its ability to distinguish between active and inactive hPTH.  *E.g.*, Tr. II at

27  106:25, 107:24-108:3.  The inventors fully disclosed their preferred mode of achieving this

28  property – the immunization with one of a group of peptides, Seq. ID Nos. 1-6.  The remainder

1    of the techniques used by the inventors were routine, known in the art, and did not contribute to

2    the properties of the claimed invention.  Therefore, the Court finds that as a matter of law the

3    best mode requirement is satisfied.

4          Although Scantibodies argues that the jury verdict of invalidity as to best mode should

5    be upheld because the inventors failed to disclose particular preferences of the inventors, the

6    absence of these preferences do not constitute a violation of the best mode requirement.  *High

7    Concrete*, 377 F.3d at 1384; *Bayer*, 301 F.3d at 1321; *Teleflex*, 299 F.3d at 1333; *Eli Lilly*, 251

8    F.3d at 956.  First, Scantibodies contends that an antibody made against hPTH 1-10 such as the

9    K-2 antibody was the only mode known to the inventors and thus by default, the best mode of

10   the claimed invention.  This argument is inapt.  The patent lists hPTH1-10 among the peptides

11   that could be used for immunization.  Patent Col. 3 & 4.  Moreover, the inventors testified that

12   the key property of the claimed antibody was its ability to selectively bind to active hPTH but

13   not inactive hPTH, and that the peptides listed in the patent, not just hPTH 1-10, could be used

14   to obtain such antibodies.  Tr. VI at 83:1-20; Tr. V at 141:14-20.  The best mode requirement

15   does not require that the inventor point out the "best" of the modes disclosed in the patent, only

16   that the inventor include that mode somewhere in the disclosure.  *Randomex Inc. v. Scopus

17   Corp.*, 849 F.2d 585, 589 (Fed. Cir. 1988).  Furthermore, although Dr. Marcus Maegerlein

18   testified that the K-2 antibody gave him the idea for the patent, Tr. VI at 55, it was not the only

19   antibody constructively or actually reduced to practice.  Three antisera K-1, K-2, K-3 were

20   produced from the animals immunized with hPTH 1-10.  Tr. V at 138:3-5.  There was no

21   testimony to indicate that the antibody obtained from the K-2 antisera was any better than any

22   other antibody of the invention.  The inventors testified that K-2 was selected for further

23   experimentations for the practical reason that its concentration (titer) was higher than the others.

24   *Id.* at 138:6-13; Tr. VI at 77:1-10.

25   / / / / /

26   / / / / /

27   / / / / /

28   / / / / /

1    Scantibodies also argues that the inventors failed to disclose their best mode of

2 immunization because they failed to include the use of multiple antigenic peptides (MAPs) in

3 the issued patent. While the evidence was conflicting regarding the inventors' preferences, even

4 assuming MAPs was a preferred method, the best mode requirement was not violated. The

5 evidence overwhelmingly indicated that this detail was a routine step for making antibodies, well

6 known in the art as of the filing date of the patent. *See e.g.*, Tr. II at 139:23-24; Tr. VI at 69-70

7 (in textbooks); Tr. VII at 62:16:24; Tr. X at 19:23-25, 20:3-5. Moreover, although the testimony

8 of the inventors and both parties' experts indicated that MAPs resulted in advantages and

9 disadvantages in the produced antibodies, the evidence uniformly indicated that one of skill in

10 the art was aware of this information. *See e.g.*, Tr. X at 19:23-25, 20:3-5; Tr. II at 101-08 &

11 139:23-24. Thus, like in *Young*, where one of skill in the art could select gear ratios and grades

12 of plastics known in the art, here, one of skill in the art could select MAPs as a routine, known

13 technique for producing antibodies. Therefore, the failure to disclose this routine detail, or any

14 other well-known routine detail in immunization such as the choice of animal to immunize, as

15 a matter of law, is not a best mode violation. *Eli Lilly*, 251 F.3d at 963-66; *Young*, 112 F.3d at

16 1144 (routine details "need not be disclosed because, by definition, their disclosure is not

17 required under the second inquiry of the best mode determination"). Furthermore, the certificate

18 of correction issued in 2002, included the description of MAPs in Example 4. Thus, with respect

19 to the corrected patent, this technique was explicitly disclosed and thus cannot be deemed a best

20 mode violation.

21    Scantibodies additionally argues that the inventors were required to disclose their

22 preference for affinity purification with the 1-37 hPTH peptide. This argument also fails. The

23 testimony did not support the assertion that purification with the 1-37 peptide was a preferred

24 mode. Dr. Maegerlein testified that he purified the K-2 antibodies from antisera using a 1-37

25 peptide of hPTH because he had an abundance of the peptide in the laboratory and because the

26 focus of his laboratory work was to select an antibody which would bind hPTH 1-37, not

27 because that particular peptide was better than any of those disclosed in the patent. Tr. VI at

28 77:22-78:7, 79:18-25. Dr. Maegerlein also indicated that many other hPTH peptides could be

1   used in the purification. Tr. VI at 80-82. Moreover, although the record supports that affinity

2   purification technique was necessary to produce the antibodies of the invention, *see e.g.*, Tr. VI

3   at 18:2-16, this method was a routine detail apparent to one of skill in the art. Plaintiff's expert

4   Dr. Vitetta testified that using the list of peptides in the '790 patent, one of skill in the art would

5   have purified the desired antibodies using affinity purification. Tr. II at 105-106, 107:12-22;

6   *accord* Tr. VII at 97 (Dr. Falkinham testified that affinity purfaction is "standard procedure").

7   Defendant's experts Drs. Wall and Woodhead testified similarly to the high level of knowledge

8   in the art for purifying antibodies using this technique. Tr. X at 63; Tr. XI at 130-131. Thus,

9   given the overwhelming body of evidence about the level of skill in the art regarding affinity

10  purification, this method constitutes a routine detail in the production of the claimed antibodies.

11  Hence, like in *Robotic Vision*, 112 F.3d at 1164-66, where the use of the computer and software

12  to carry out the claimed scanning method was implicitly disclosed in the specification based on

13  the level of skill in the art, here, affinity purification is an implicit disclosure based on its routine

14  use in the art. Therefore, as a matter of law, the absence of explicit mention of this detail from

15  the patent specification does not violate the best mode requirement.

16      In summary, based on the applicable law as applied to the evidence adduced at trial, the

17  inventors disclosed their best mode for practicing the claimed invention.[10] Therefore, as a matter

18  of law, the jury's finding that the '790 patent is invalid for a best mode violation cannot stand.

19      B. <u>Scantibodies' JMOL on Infringement</u>

20      Scantibodies asks the Court to overturn the jury's determination that Scantibodies' 1-9

21  PTH assay infringed Claims 17 and 21 on the ground that the Court, at the last minute,

22  incorrectly altered the claim construction.

23      The Court denies the motion because the Court correctly and consistently construed the

24  term "selectively binds" in the '790 patent. The Court has consistently construed the term

25  "selectively binds" to means "seeks out specifically and attaches to a specific arrangement of

26

27      [10]Nichols has also argued that the jury's verdict cannot stand because Scantibodies failed to provide clear and convincing evidence that the inventors intentionally concealed their best mode. Scantibodies argues in opposition that intent is not a required element to

28  prove a best mode violation. Because the Court finds that the inventors disclosed their best mode, the Court does not reach these issues.

02cv0046

1    atoms or molecules." Based on the context of this patent, the Court concluded that selective

2    binding allowed the claimed antibodies to attach to peptides longer than the ten amino acids

3    listed in Seq. ID No. 1 as long as the peptide seeks out and attaches to the arrangement of atoms

4    molecules described in Seq. ID No. 1.

5         Scantibodies disagrees. Scantibodies contends that the term "selectively binds" means

6    "preferentially binds." By this Scantibodies states that the claimed antibodies should have a

7    stronger affinity to one of the six peptides listed, than to any other peptides. Scantibodies argues

8    that the claimed antibodies must bind *one of the claimed antibodies more strongly* than they bind

9    hPTH 1-37 or hPTH 1-84 – even though these longer sequences also contain the short sequences

10   set forth in Claims 17 and 21. Scantibodies contends that when the term "selectively binds" is

11   properly construed, the evidence produced at trial mandates a finding of non-infringement by

12   its 1-9 antibody.

13        The Court rejects the argument. A person skilled in the art would read the claims to cover

14   antibodies that bind *at a claimed sequence within a longer peptide. See generally* Tr. VII at 66-

15   97 (Dr. Falkinham). Pursuant to this construction of the term, the evidence at trial was

16   uncontradicted that Scantibodies' 1-9 antibody literally infringed the claims at issue.

17   Defendants' critical expert witness, Dr. Lerner admitted that Scantibodies' 1-9 antibody does

18   bind to 1-9 peptides. Tr. IX at 71:10-73:4; *see id* at 79:5-11. Dr. Lerner's expert opinion – and

19   Scantibodies' theory of defense – relied solely on the assertion that the products did not infringe

20   because they "preferred" peptides such as 1-84. *E.g. id.* at 72:1-24; 76:10-20; 84:4-8; 87:1-9;

21   136:7-137:8.

22        Reading the term in the manner suggested by Scantibodies would undermine Claims 1-16

23   of the '790 patent. These claims cover a two-sided immunoassay where one antibody binds at

24   the front of the peptide while a second antibody binds to an epitope located within amino acids

25   24-37. Non-asserted claims may be useful in construing terms found in the asserted claims.

26   *Phillips v. AWH Corp*, 415 F.3d 1303, 1313-15 (Fed. Cir. 2005) (context of asserted claims).

27   Here, Claim 1 is instructive. Claim 1 requires two antibodies where the first antibody selectively

28   binds to a peptide of hPTH having Seq. ID. Nos. 1-6, and the second antibody selectively binds

1   to an epitope contained within amino acids 24-37 of hPTH.  Patent 2:1-31 & 25:12-20.  This

2   claim requires that the first antibody seek out and attach to a peptide at least 25 amino acids long.

3   Otherwise there will be no place on the peptide for the second antibody to attach.

4        To read the term "selectively binds" in the manner urged by Scantibodies would require

5   reading it in a manner that is counterintuitive with how the antibodies are described to act in

6   Claim 1.  The Court's construction construes the term within the context of the patent as a

7   whole.  For example, construing "selectively binds" to mean seeks out specifically and attaches

8   to the arrangement of atoms or molecules described in Seq. ID No. 2 allows the claimed first

9   antibody to attach to the first nine amino acids of hPTH 1-37 or one through hPTH 1-84, and

10   allows the claimed second antibody to bind to an epitope found within amino acids 24-37.

11   Because Scantibodies' proposed construction is not consistent with the context of the patent as

12   a whole, the Court rejects it.  *Phillips*, 415 F.3d 1303.

13        The goal of the '790 patent was to use the "peptides in the preparation of an agent for

14   diagnosing biologically <u>active</u> hPTH."  Patent 1:6-9 (emphasis added).  The Patent emphasized

15   that the biological activity was "completely lost without the first two amino acids, serine and

16   valine."  Thus the critical teaching of the invention was these unique antibodies, not the

17   identification of the other 1-34.  The patentee expressly distinguished the invention from the

18   prior art that was "not capable of *discriminating between biologically active* and biologically

19   inactive PTH (1-84) or fragments thereof lacking the first two amino acids."  Patent 2:21-29 (this

20   invention eliminates the drawbacks of prior art, and allows the diagnosis of biologically active

21   hPTH); *id.* 5:1-38; *id.* 25:13 (Claim No. 1); *id.* 25:43-58 (Claim 9).  Consequently, Scantibodies'

22   reliance on Dr. Lerner's opinion concerning preference, *e.g.*, Tr. IX at 72-76, misses the point.

23   *E.g,* Tr. VII at 75-89 (Dr. Falkinham describes selective binding and states that the strength of

24   the binding relative to other antibodies is not relevant to the invention).

25        In its attempt to persuade the Court, Scantibodies relies upon *Chef America v. Lamb-*

26   *Weston, Inc.*, 358 F.3d 1371 (Fed. Cir. 2004), for the proposition that the antibodies described

27   in Claim 17 can only bind to a peptide no more than ten amino acids in length.  According to

28   Scantibodies, the Court must construe the Claim to require binding only to a peptide listed in

1 | Claim 17.  The Court sees no disagreement between its current construction and *Chef America*.

2 | Indeed, the case supports the Court's ruling.

3 | In *Chef America*, the Federal Circuit considered a patent that required baking dough "to"

4 | a specified temperature, which would have resulted in an unuseable product (*i.e.*, dough would

5 | be "burned to a crisp" and resemble "a charcoal briquet").  *Id.* at 1372-74.  The most likely

6 | reading of the patent would be to require baking at 450 degrees by heating the oven to the

7 | specified temperature; however, the Court enforced the settled practice that when a patentee uses

8 | simple words such as "to" or "at," the patentee is bound by the meaning of those words.  *Id.*

9 | ("Even a nonsensical result does not require the court to redraft the claims").  This rule also

10 | prohibits an expert from re-writing the claims.  *Id.* at 1375.  Moreover, the prosecution history

11 | revealed that the inventor had consciously chosen the word in order to obtain the patent.  *Id.* at

12 | 1374-75.

13 | *Chef America* is inapposite to this case.  Here, the Claims 17 and 21 require that the

14 | antibody seek out specifically and bind to the arrangement of molecules described in Seq. ID No.

15 | 2.  But there is no language suggesting that the antibody cannot bind to a peptide *longer than* the

16 | nine amino acids described in Seq. ID No. 2.  Scantibodies' suggestion would entail re-writing

17 | the claim in order *to add that restriction*.  Here, as long as the antibody specifically seeks out and

18 | binds the peptide described in Seq. ID No. 2 and specifically seeks out and binds the longer

19 | peptide at a site where all nine of those amino acids are present in the same sequence described

20 | in the claims, the antibody selectively binds within the manner claimed by the '790 patent.

21 | In sum, since there was substantial evidence before the jury that Scantibodies' 1-9

22 | antibody does selectively bind to the nine amino acids in Seq. ID No. 2, the Court will not set

23 | aside the jury verdict of infringement.

24 | C. Nichols' JMOL on Infringement

25 | Nichols argues that it is entitled to judgment as a matter of law that Scantibodies' 1-12

26 | antibody, like the 1-9 product, infringed the '790 patent.  The Court agrees that the jury's verdict

27 | of non-infringement is not supported by substantial evidence.

28 | The clear and uncontradicted evidence showed that the test data demonstrated that

02cv0046

1  Scantibodies' 1-12 antibody infringed Nichols' patent. *E.g.*, Tr. VII at 90-93 (Dr. Joseph

2  Falkinham reviewed testing data from Dr. Leonard Deftos' study that showed the 1-12 PTH

3  antibody infringes) & 99-120 (Dr. Falkinham discusses Scantibodies' publications, Pl.'s Ex. 30

4  (Markus John, et al., 84 J. of Clinical Endocrinology & Metabolism 4287-90 (1999)), and Pl.'s

5  Ex. 429 (Ping Gao, et al., J. of Bone & Mineral Res. 605-14 (2001)); Tr. VI at 160-66 (Dr. Gao's

6  videotaped deposition describes Scantibodies' 1999 and 2001 publications); Tr. IX at 136 & 138

7  (Dr. Lerner); Tr. XII at 169-71 (Dr. Falkinham's opinion). More specifically, Dr. Falkinham

8  explained to the jury that blind testing proved that Scantibodies' 1-12 product (like the 1-9

9  product) would selectively bind to a specific arrangement of molecules so as to distinguish the

10  biologically active PTH. Tr. VIII at 38-50.[11] This evidence was not contradicted by

11  Scantibodies, as its own chief expert witness agreed with the factual statement that the 1-12

12  antibody infringed Claim 17 of the '790 patent by "binding" to the peptide having Seq. ID. Nos.

13  1-6. Tr. IX at 71:10-72:24. In addition, Scantibodies' Chief Operating Officer admitted that

14  Scantibodies' 1-9 antibody "worked just the same" way as the 1-12 antibody. Tr. XI at 5 (John

15  Van Duzer).

16      There was no evidence presented that Scantibodies' two products had different binding

17  characteristics, and Scantibodies in this motion does not dispute the underlying facts. Instead,

18  Scantibodies relies on its legal theory that the term "selectively" binds in Claim 17 should be

19  construed to mean "preferentially" binds. Defs.' Opp. Br. at 15-17 (citing Dr. Lerner's data that

20  antibody prefers the 1-84). As discussed above, *supra* pages 15-17, the Court is not persuaded

21  by this argument. Scantibodies' proposed construction of the claim is not valid or accurate as

22  a matter of law. The goal of the '790 patent was to detect biologically active matter, and the

23  uncontradicted evidence produced at trial shows that Scantibodies' 1-12 product infringed the

24  claimed invention in that regard. *E.g.*, Tr. VII at 92-93 (Dr. Falkinham testified that 1-12

26  ___

[11]At trial, Dr. Falkinham explained to the jury the meaning of a laboratory report that had been performed on the two Scantibodies' products. *See* Tr. VIII at 36. That report was displayed as two bar charts, one for each product. Pl.'s Ex. 229. Because the trial exhibits had been returned to counsel at the end of the liability phase, Nichols displayed the bar charts for the Court during the August 15, 2005 motion hearing on the JMOL motion (Power Point Slides Nos. 18 (Scantibodies' 1-9 antibody) & 19 (Scantibodies' 1-12 antibody).

1  product infringed); Tr. IX at 71:10-72:24 (Dr. Lerner testified that 1-12 antibody binds to amino

2  acids with a length between 5 and 9 in his laboratory tests).  Scantibodies' continued reliance

3  on the preference between two biologically active peptides, when given the choice of a longer

4  peptide, is not the invention.  Moreover, Scantibodies' theory does not alter the fact that it

5  "binds" to biologically active PTH (selected from the group consisting of peptides having Seq.

6  ID Nos. 1-6). This constitutes literal infringement; thus, Scantibodies' reference to the doctrine

7  of equivalents is inapposite.

8          Consequently, all of the evidence demonstrated that Scantibodies' 1-12 antibody also

9  infringed the Nichols' patent.

10  II. Nichols' New Trial Motion

11          Nichols seeks a new trial pursuant to Rule 59 of the Federal Rules of Civil Procedure on

12  three grounds.  Nichols first argues prejudicial misconduct by opposing counsel, and second,

13  finds prejudicial error in a jury instruction on invalidity.  Finally, Nichols seeks a new trial on

14  whether the 1-12 antibody infringes.

15          Although the Court has determined that Nichols is entitled to a judgment in its favor as

16  a matter of law on the patent validity and infringement issues, the Rules of Civil Procedure

17  require the Court to rule also on the motion for a new trial.  Fed. R. Civ. P. 50(c)(1).

18          A new trial may be granted to correct a verdict that was "contrary to the clear weight of

19  the evidence," or that are a result of errors of law, such as an erroneous jury instruction.  Fed.

20  R. Civ. P. 59; *Murphy v. City of Long Beach*, 914 F.2d 183, 187 (9th Cir. 1990) (quotation

21  omitted).

22          In making this evaluation, the district court is permitted to weigh the evidence as a whole,

23  and to assess the credibility of witnesses.  *Murphy*, 914 F.2d at 187.  The court need not view

24  the evidence in the light most favorable to the party who prevailed at trial; but instead, when the

25  court has a "definite and firm conviction that a mistake has been committed," the court may set

26  aside the jury's verdict.  *Id.*; *Landes*, 833 F.2d at 1371 (court must also consider "a decent

27  respect for the collective wisdom of the jury, and for the function entrusted to it in our system").

28  /////

A. Attorney Misconduct

Nichols contends that a new trial is necessary because counsel for Scantibodies made inflammatory unethical accusations about counsel for Nichols in front of the jury foreperson. Nichols argues that a new trial is necessary to prevent injustice. Pls.' NT Br. at 8.

On June 23, 2005, the third day of deliberations, counsel appeared in the courtroom to discuss correcting a defective third supplemental jury instruction that had been distributed the preceding day. Tr. XVII at 1-2; Court's Ex. 9B. The Court proposed, and the attorneys agreed, to assemble the complete jury to inform them of the situation, and then to question the foreperson. Tr. XVII at 2-6.

Once the jury took their seats in the courtroom, the Court explained that it had interrupted the deliberations because the Court had made a "slight error" concerning a supplemental instruction and needed to speak briefly to the foreperson. *Id.* at 7. The foreperson remained in the courtroom, but the other jurors returned to the jury room. *Id.*

While the bailiff held open the door for the other jurors to return to the jury room, one of the defense attorneys for Scantibodies stated, quite audibly, that he saw one of the plaintiff's attorneys looking into the jury room at an easel. *Id.* at 7-8. Defense counsel stated that he believed the jurors recorded a tally of their preliminary votes on the easel.[12] *Id.* The foreperson could hear these comments, as she was sitting in the jury box at the time. It is *possible* that some of the other jurors could have heard, as the bailiff was holding open the door at the time.[13]

The Court then interviewed the foreperson about correcting the supplemental jury instruction, and upon resolving that problem, excused her to the jury room to resume

---

[12]Specifically, defense counsel stated: "Your honor, if you don't mind, just – [bailiff], could you – when you open the door, there's an easel, and there's something – I saw [plaintiff's counsel] kind of looking around the corner there. Could you move the easel out of their view. I don't want us to see – there's – it looks like counts going on there. I don't know – I couldn't read it, but I think . . . if I was a little closer, I could have read it." Tr. XVII at 7-8.

[13]At the time of the incident, it was disputed whether the foreperson and/or the other jurors could have heard the remark. Tr. XVII at 13-14; Cohler Decl. ¶ 4. The reporter's transcript shows that the foreperson was sitting in the jury box when defense counsel made the comment. Tr. XVII at 7-8. The Court declines to infer that any of the other jurors heard the exchange.

1  deliberations. *Id.* at 8-11 & 14-15.

2         In the courtroom and outside of the presence of all members of the jury, plaintiff's

3  counsel then raised the matter of defense counsel's accusation. *Id.* at 12. As a remedy,

4  plaintiff's counsel stated "through the Court, I would respectfully ask for an apology." *Id.* at 13.

5  None of the attorneys for Nichols asked for any other relief. Defense counsel offered the

6  following: "I apologize, your Honor, to the extent that it was meant to impugn." *Id.*

7         "A new trial is warranted on the ground of attorney misconduct during the trial where the

8  'flavor of misconduct . . . sufficiently permeate[s] an entire proceeding to provide conviction that

9  the jury was influenced by passion and prejudice in reaching its verdict.'" *Anheuser-Busch, Inc.*

10  *v. Natural Beverage Distrib.*, 69 F.3d 337, 346 (9th Cir. 1995) (quoting *Kehr v. Smith Barney,*

11  *Harris Upham & Co.*, 736 F.2d 1283, 1296 (9th Cir. 1984) (quoting *Standard Oil Co. of*

12  *California v. Perkins*, 347 F.2d 379, 388 (9th Cir.1965)).

13         Nichols contends that the jury heard defense counsel's "inflammatory and prejudicial"

14  remarks. Pl.'s NT Br. at 17-18. Nichols argues that the layout of the courtroom demonstrate that

15  defense counsel's accusation was false. Cohler Decl. ¶ 5. Nichols argues the remarks were

16  particularly grievous because defense counsel suggested that if he had been closer to the jury

17  room, he also could have read the tally to discover how the jury had been voting. Pls.' NT Br.

18  at 18. Because the Court instructed the bailiff to move the easel away from any possible view

19  through the doorway, Nichols argues that the jury would have assumed that the allegation of

20  misconduct was valid. Moreover, the jury did not hear plaintiff's counsel deny the accusation,

21  and may have taken that silence as evidence of misconduct. *Id.* at 19 & 22. Nichols also

22  complains that the Court did not instruct the jury to disregard the accusation.

23         Nichols contends that there is circumstantial evidence that the remarks affected the

24  deliberations. Nichols analyzed the jury's ultimate special verdict in relation to the notes from

25  the jury, and speculates that the jury had been deciding the case in Nichols' favor *until* the time

26  when defense counsel made the "vile" comment. Pls' NT Br. at 22-23. Nichols states that this

27  demonstrates defense counsel's misconduct was prejudicial, the remarks violated the sanctity

28  of jury deliberations, and Nichols equates the accusation as the introduction of extraneous

- 22 -

1  evidence. Pls.' NT Br. at 20. Nichols also analogizes defense counsel's comment to improper

2  contact with a deliberating jury about the vote count. Pls.' NT Br. at 21.

3      Although the Court does not condone defense counsel's conduct, the Court does not view

4  it as sufficient reason to conduct a retrial of the patent claims. *Chalmers v. City of Los Angeles*,

5  762 F.2d 753, 761 (9th Cir. 1985) (attorney misconduct does not warrant new trial "unless there

6  was a prejudicial defect in the proceedings"). The Court considers the outburst inappropriate.

7  The proper course would have been to raise the concern at a sidebar conference, out of the

8  hearing of the foreperson. The dramatic manner of the remarks was unfortunate, and particularly

9  in light of the professional experience of counsel, it should not have happened. The Court views

10 it as an isolated and aberrant misstep in the fervor of a lengthy and contentious trial.

11     However regrettable the incident, the Court is confident that it did not undermine the

12 fairness of the trial or otherwise influence the jury's deliberations. This was not the type of

13 remark that constitutes fundamental error. *Settlegoode v. Portland Public Schools*, 371 F.3d

14 503, 517 (9th Cir. 2004) (though trial judge found counsel's conduct outrageous, new trial was

15 not warranted); *Chalmers*, 762 F.2d at 761 (personal attacks between lawyers did not affect

16 jury's verdict); *cf. Fraige v. American-National Watermattress Corp.*, 996 F.2d 295, 297 (Fed.

17 Cir. 1993) (document alterations, tainted evidence, and misrepresentations infected trial and

18 could have affected jury's findings). Nichols' theory of prejudice is speculative, and does not

19 constitute "'concrete showing of prejudice.'" *Hemmings v. Tidyman's Inc.*, 285 F.3d 1174, 1193

20 (9th Cir. 2002) (quoting *Moses v. Union Pac. R.R.*, 64 F.3d 413, 418 (8th Cir. 1995)); *id.* (new

21 trial "remedy is available only in 'extraordinary circumstances'") (quoting *Bird v. Glacier Elec.*

22 *Coop., Inc.*, 255 F.3d 1136, 1148 (9th Cir. 2001)).

23     The Court rejects Nichols' argument that it was similar to extraneous evidence because

24 the comment did not concern the subject matter of patent validity or infringement. *Sea Hawk*

25 *Seafoods, Inc. v. Alyeska Pipeline Serv. Co.*, 206 F.3d 900, 905 & n5, 907 (9th Cir. 2000)

26 (extraneous evidence is information about the disputed facts or the applicable law and is more

27 harmful to the deliberative process); *cf. Union Carbide Chems. & Plastics Tech. Corp. v. Shell*

28 *Oil Co.*, 308 F.3d 1167, 1183 (Fed. Cir. 2002) (attorney's improper comments on invalidity of

02cv0046

1  patent did not influence jury's verdict). Nor did the incident disrupt the sanctity of the jury's

2  deliberations.

3       It was one incident in a lengthy trial. *See Glasser v. United States*, 315 U.S. 60, 83 (1942)

4  ("The trial was long and the incidents relied on by petitioners few. We must guard against the

5  magnification on appeal of instances which were of little importance in their setting."). As noted

6  by the Court on several occasions, this jury (and the foreperson in particular) was extremely

7  conscientious. The Court had instructed the jury to consider only the evidence produced at trial

8  and to not regard comments by the attorneys as evidence. Court's Instruction No. 3; Tr. XIII at

9  5. The questions asked during deliberations shows that the jury focused on the factual and legal

10  issues presented at trial, and not on the interactions between counsel.

11       Finally, other than expressing anger at the accusation, Nichols did not ask the Court for

12  relief at the time. Nichols did not request a curative jury instruction, nor did he make a proper

13  objection, but treated it as a personal attack.[14] Tr. XVII at 12-13; *Settlegoode*, 371 F.3d at 517;

14  *Hemmings*, 285 F.3d at 1192-93; *Kaiser Steel Corp. v. Frank Coluccio Constr. Co.,* 785 F.2d

15  656, 658 & n.2 (9th Cir. 1986); *see United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 238-

16  39 (1940).  All counsel are experienced litigators and are certainly aware that they could have

17  asked the Court for any number of remedies. Yet, counsel did not ask the Court to question the

18  foreperson about whether she heard the comments, and whether she felt they would impair her

19  ability to deliberate in good faith. Counsel did not ask the Court to admonish the foreperson that

20  the exchange between the attorneys was irrelevant and should be disregarded.  Counsel did not

21  ask the Court to take any type of curative action *as to the foreperson or any other member of the*

22  *jury;* instead, counsel sought a personal apology for the perceived insult.  Had counsel sought

23  an inquiry, polling, or curative instructions, such relief would most certainly have been available.

24  The Court did not, in the circumstances, deem it advisable to *sua sponte* give an unrequested

25  instruction, as such interference could have drawn even more attention to the remarks.

26  /////

27

---

28  [14]At the conclusion of the conference, Nichols' attorney indicated that he would submit proposed jury instructions on the *merits* of the issue involved in supplemental jury instruction number three. Tr. XVII at 15-16.

B. <u>Best Mode Jury Instruction</u>

Nichols' second ground for a new trial has merit.  Nichols argues that the Court erroneously instructed the jury on the best mode requirement of § 112.  The Court's instruction was largely based upon the proposal provided by Scantibodies. Defs.' Proposed Jury Instruction No. 30 (filed May 25, 2005).  The Court overruled Nichols' objection and declined to give the alternate instruction suggested by Nichols.  Tr. at 98-126 (June 10, 2005 In Chambers Conference); *id.* at 111.

At trial, the Court instructed the jury as follows, in its relevant part:

> You must determine whether the inventors disclosed the "best mode" of practicing the claimed invention to the U.S. Patent and Trademark Office within the contents of the patent application.  The law requires that "the specification shall set forth the best mode contemplated by the inventor carrying out his invention."  If the inventor had specific processes, techniques, compositions, material or conditions that he or she recognized at the time of filing as the best way of carrying out the invention, then he or she must include that information in the patent disclosure. *If, however, the inventor did not contemplate a "best" mode of practicing the claimed invention, the inventor must disclose one mode, if known to the inventor, either expressly or implicitly.*

Jury Instruction No. 22 (emphasis added).  The italicized sentence at the end of the paragraph was added by the Court after conferring with counsel.  *E.g.*, Tr. at 100 (June 10, 2005 In Chambers Conference); *cf.* Defs.' Proposed Jury Instruction No. 31 (filed May 25, 2005).  This sentence was taken from *Robotic Vision*, 112 F.3d at 1166 ("Even an only mode must be disclosed, expressly or implicitly.").

By contrast, Nichols suggested an instruction with a detailed explanation of the law.  Pl.'s Proposed Jury Instruction No. 60 (filed  May 25, 2005).  That instruction began by explaining that "[t]he patent laws require that if the inventor knew of a best way, or 'mode,' of making and using the claimed invention . . . , then the patent specification must contain a description of that mode." *Id.*  After explaining the purpose of the requirement, the proposed instruction explained that there were two questions, and the first question was the inventor's subjective state of mind. *Id.*[15]  In language that the Court now recognizes as accurately explaining the second element,

---

[15]Nichols' proposed language continued that "[i]f you find that the answer to the first question is no – that is, the inventor did not know of a best mode of making or using his or

(continued...)

Nichols' proposed instruction focused on the fact that the patentee need not repeat information that is well-known in the field. "Does the patent contain a description of the inventor's best mode that is sufficient to enable a person skilled in the art to carry out the best mode? This question is objective. It depends, not on what the inventor thought or understood, but rather on what a person skilled in the field of the invention reading the patent would understand." *Id.*

"Jury instructions must be formulated so that they fairly and adequately cover the issues presented, correctly state the law, and are not misleading." *Gulliford v. Pierce County*, 136 F.3d 1345, 1348 (9th Cir. 1998). The Court agrees with Nichols' argument that the best mode instruction violated these standards. The Court's modified instruction did not correctly state the Federal Circuit law on best mode. *See supra* pages 9-15 (validity section on best mode requirement); *Chemcast*, 913 F.2d at 926-27. The additional language erroneously told the jury that it could find a best mode violation simply by finding that the inventors did not disclose "one" mode. Scantibodies emphasized the "one mode" language in its closing argument. Tr. XII at 139.

The Court neglected to clarify this language, and indeed, the improper test lead the jury astray. *See Cabrellero v. City of Concord*, 956 F.2d 204, 207 (9th Cir. 1992) (when "jury's verdict may have resulted from a misapprehension of the law," instruction caused prejudice). The instruction allowed the jury to impose an unnecessary burden on the inventor to disclose a mode that was well known in the art. *E.g.*, *High Concrete Structures, Inc. v. New Enter. Stone and Lime Co.*, 377 F.3d 1379, 1383 (Fed. Cir. 2004 ("The best mode requirement of § 112 is not violated by unintentional omission of information that would be readily known to persons in the field of the invention.") (collecting cases, including *Robotics*, 112 F.3d at 1166); *W.L. Gore & Assocs., Inc. v. Garlock, Inc.*, 721 F.2d 1540, 1556-57 (Fed. Cir. 1983) (same). The *Robotics* decision itself – the source of the quotation – illustrates this principle because the Federal Circuit

---

[15](...continued)
her invention at the time the application was filed – you should stop there. The patent cannot be invalid for failure to disclose the best mode if the inventor did not know of a best mode when the application was filed." *Id.* As discussed above, the Court finds that the patentee did envision a best mode; thus, the Court does not accept Nichols' theory of this subjective element of the best mode analysis. Nor does the Court reach the intentional concealment issue because the Court concludes that Nichols revealed all that it was required to disclose.

02cv0046

found that the inventor had satisfied the best mode requirement "implicitly" based upon the knowledge that was well known in the field. *Robotics*, 112 F.3d at 1166 ("The patent cannot be held to fail to comply with the best mode requirement for lack of the word 'software,' the use of which was plainly apparent to one skilled in the art. Such a disclosure was implicit in the specification."). The Court should have, as Nichols' articulates, provided further guidance regarding the type of information that actually is and is not required to be disclosed in the patent application. *See Chemcast*, 913 F.2d at 928 (second part of best mode analysis tests the *adequacy* of the disclosure).

The need for a new trial is also supported by the jury's question in the midst of deliberations. The jury asked for clarification of the last sentence of Instruction No. 22. Tr. at 12-13 (June 24, 2005 In Chambers Conference); Court's Ex. 11. The Court's answer did not clarify the issue, and it repeated the incorrect statement of law. Court's Supp'l Jury Instruction No. 4; Tr. at 26 (June 24, 2005 In Chambers Conference). Nor did the Court heed Nichols' renewed objection that the *Robotics* decision did not support Scantibodies' assertion that an inventor must always disclose "one" mode to satisfy the best mode requirement. *Id.* at 22-24, 28-31 (June 24, 2005).

The Court also agrees with Nichols that the instruction would have necessarily influenced the jury's understanding of the related elements of § 112. *See Chuman v. Wright*, 76 F.3d 292, 295 (9th Cir. 1996); *Westinghouse Elec. Corp. v. General Circuit Breaker & Elec. Supply Inc.*, 106 F.3d 894, 903 (9th Cir. 1997) ("when faced with an outcome-determinative error in instructing the jury, a trial judge should order a new trial"). The Court blurred the elements of best mode and enablement thereby creating confusion. The confusion was further compounded by the order of the jury instructions. The Court explained (incorrectly) the best mode requirement, and then instructed the jury on the written description and enablement requirements. This sequence exacerbated the Court's error. Because the jury was told that, to comply with the best mode requirement, the patentee must disclose "one" mode – regardless of whether the mode was readily apparent to a skilled scientist – it necessarily follows that a finding of a best mode violation triggered enablement and written description violations. The incorrect

1   instruction affected the jury's verdict of the written description element and enablement

2   requirements, and therefore all three of these requirements will be retried, if required.  Fed. R.

3   Civ. P. 50(c).

4        C. Infringement

5        Nichols also seeks a new trial on the argument made in its JMOL motion that

6   Scantibodies' 1-12 product infringes.  Nichols bears the burden to prove infringement by a

7   preponderance of the evidence.  *Cybor Corp. v. FAS Techs.*, 138 F.3d 1448, 1454 (Fed. Cir.

8   1998) (en banc).  The court can weigh the evidence as a whole to determine if a new trial is

9   necessary.  *Murphy*, 914 F.2d at 187 (new trial can be ordered when court has firm conviction

10  that jury mistakenly evaluated the clear weight of evidence).  In the event that the Court's JMOL

11  ruling is reversed on appeal, the Court concludes that Nichols is entitled to a new trial on the

12  issue of whether this product also infringes.  As discussed above, *supra* page 21, the jury's

13  verdict was contrary to the clear weight of evidence that both of Scantibodies' competing

14  products seek out and attach to a specific arrangement of atoms on hPTH 1-9 so as to infringe

15  the '790 patent.

16                     CONCLUSION

17       Upon due consideration of the parties' memoranda and exhibits, the arguments of counsel,

18  a review of the record, and for the reasons set forth above:

19       1. The Court **DENIES** Defendants' motion for relief from judgment and renewed motion

20  for judgment as matter of law [# 585-1 & 585-2]; and **GRANTS** Plaintiff's renewed motion for

21  a judgment as a matter of law [# 574].  Accordingly, the Court **VACATES IN PART THE**

22  **JUDGMENT** entered on June 29, 2005 [ #572].  The Court has prepared a separate Amended

23  Partial Judgment that reflects the Court's rulings in these post-judgment proceedings.

24       2.  The Court **VACATES** the hearing on Plaintiff's motion to re-tax costs, previously

25  set for September 6, 2005.  That motion is deemed **DENIED** without prejudice and subject to

26  renewal upon completion of the damages phases.  [# 611] All issues pertaining to costs shall be

27  held in abeyance pending final judgment.

28       3. As a conditional ruling, the Court **GRANTS IN PART AND DENIES IN PART**

                              - 28 -                        02cv0046

1  Plaintiff's motion for a new trial [# 577].  In the event that the Court's judgment as a matter of

2  law is reversed on appeal, Plaintiff is entitled to a new trial on the specific issues of (1) validity

3  under 35 U.S.C. § 112, and (2) infringement by Defendants' 1-12 antibody.

4      4.  The Court will convene a status hearing on **September 6, 2005 at 9:00 a.m.** in

5  Courtroom 2  to set a trial date for the damage phase.  By separate order, the Court has resolved

6  the Defendants' fifth motion *in limine* on damages.

7      IT IS SO ORDERED.

8  DATED:___8-30-05___          _____

9                              UNITED STATES SENIOR DISTRICT JUDGE

10  cc:     All Parties

- 29 -

02cv0046